J. A21028/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| LANIER JAMES, | : | |
| A/K/A JAMES LANIER, | : | |
| Appellant[1] | : | No. 2865 EDA 2015 |

Appeal from the Judgment of Sentence August 14, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0008145-2014

BEFORE: BENDER, P.J.E., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:                **FILED SEPTEMBER 15, 2016**

Appellant, Lanier James, appeals from the Judgment of Sentence entered by the Philadelphia County Court of Common Pleas following his conviction by a jury of Carrying a Firearm Without a License, Carrying a Firearm in Public in Philadelphia, Possession of an Instrument of Crime, and Fleeing or Attempting to Elude Police Officer.[2]   After careful review, we affirm on the basis of the trial court's Opinion.

We adopt the facts as set forth by the trial court.  *See* Trial Court Opinion, filed 12/21/15, at 3-11.  In summary, Appellant's accomplice,

---

[1] We changed the caption to reflect Appellant's alias.

[2] 18 Pa.C.S. § 6106; 18 Pa.C.S. § 6108; 18 Pa.C.S. § 907; and 75 Pa.C.S. § 3733, respectively.

Braheem Owens, shot and killed the victim on a West Philadelphia street on May 28, 2014. After shooting the victim, Owens entered Appellant's car and Appellant sped away from the scene with an officer in pursuit. Several blocks away, Appellant and Owens exited the car and fled on foot. After a brief pursuit, police apprehended Appellant in possession of a firearm that matched six fired cartridge casings recovered from the scene of the shooting.

On May 28, 2015, the jury convicted Appellant of Carrying a Firearm Without a License, Carrying a Firearm in Public in Philadelphia, Possession of an Instrument of Crime, and Fleeing or Attempting to Elude Police Officer.[3] On August 14, 2015, the trial court imposed a term of six to twelve years' imprisonment, followed by seven years' probation. Appellant filed a Notice of Appeal on September 8, 2015. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents three issues for our review:

1. The evidence was insufficient as a matter of law to support [Appellant's] conviction for Carrying a Firearm Without a License in violation of 18 P.S. §6106, where the Commonwealth failed to present evidence that [Appellant], Lanier James, did not possess a valid license and where proof of [Appellant's] non-licensure was an essential element of the offense.

2. The evidence was insufficient as a matter of law to support [Appellant's] conviction for Fleeing or Attempting to Elude

---

[3] The jury acquitted Appellant of First-Degree Murder and Criminal Conspiracy.

Police in violation of 75 P.S. §3733, where the Commonwealth failed to present evidence that [Appellant], Lanier James, willfully failed or refused to bring his vehicle to a stop in response to a "visual and audible signal" to bring his vehicle to a stop or fled or attempted to elude pursuing police in a vehicle, as a opposed to on foot, after he parked his car and ran from the police.

3.      The trial court erred by allowing the prosecutor, in closing argument, to argue facts not in evidence and by permitting the prosecutor to tell the jury that [Appellant] falsified his identity to the police and gave the name of James Lanier, as opposed to Lanier James, when he was arrested where the record and non-record evidence suggested that the police made the clerical mistake of juxtaposing [Appellant's] name at the time of his arrest.

Appellant's Brief at 4 (capitalization omitted).

Appellant first challenges the sufficiency of the evidence supporting his convictions for Carrying a Firearm Without a License and Fleeing or Attempting to Elude Police Officer.   We review claims challenging the sufficiency of the evidence by considering whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, "there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Melvin*, 103 A.3d 1, 39 (Pa. Super. 2014).

The trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—may choose to believe all, part, or none of the evidence.  *Id*. at 40.   Moreover, a jury may base a conviction solely on circumstantial evidence.  *Id*.   In conducting our review, the appellate court

may not weigh the evidence and substitute its judgment for that of the fact-finder. *Id*. at 39-40.

The relevant statutes provide the following:

**§ 6106. Firearms not to be carried without a license**

**(a) Offense defined.—**

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, … without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106(a)(1).

**§ 3733. Fleeing or attempting to elude police officer**

(a) *Offense defined.* --Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop, commits an offense as graded in subsection (a.2).

75 Pa.C.S. § 3733.

The Honorable Genece E. Brinkley, sitting as the trial court, has authored a comprehensive, thorough, and well-reasoned opinion, citing to the record and relevant case law in addressing Appellant's sufficiency challenges. After a careful review of the parties' arguments and the record, we affirm on the basis of the trial court's Opinion. **See** Trial Court Opinion at 12-16 (concluding: (1) there was sufficient evidence to support Appellant's conviction for Carrying a Firearm Without a License because (i) police recovered the firearm from Appellant's waistband and (ii) the certificate of

non-licensure contained sufficient identifying information, including Appellant's name, home address, and date of birth; and (2) there was sufficient evidence to support Appellant's conviction for Fleeing or Attempting to Elude Police Officer because Appellant fled past a uniformed officer with his gun drawn at a high rate of speed after his passenger shot and killed the victim and the officer tried to stop Appellant's vehicle by chasing after Appellant while shouting over his radio).

Appellant next challenges the prosecutor's closing argument and avers that the prosecutor improperly argued facts not in evidence. In addressing prosecutorial misconduct alleged to have occurred during closing argument, our Supreme Court has provided the following guidance:

> In accord with the long-standing principle that a prosecutor must be free to present his or her arguments with logical force and vigor, this Court has permitted prosecutorial advocacy as long as there is a reasonable basis in the record for the [prosecutor's] comments. Prosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair. Furthermore, the prosecution must be permitted to respond to defense counsel's arguments. Any challenged prosecutorial comment **must not be viewed in isolation**, but rather must be considered in the context in which it was offered.
>
> It is improper for a prosecutor to offer his or her personal opinion as to the guilt of the accused or the credibility of any testimony. However, it is well within the bounds of proper advocacy for the prosecutor to summarize the facts of the case and then ask the jury to find the accused guilty based on those facts.
>
> The standard by which the court considers allegations of improper prosecutorial comments is a stringent one:

> Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

***Commonwealth v. Chmiel***, 30 A.3d 1111, 1146-47 (Pa. 2011) (citations omitted, emphasis in original).

After a careful review of the parties' arguments and the record, we affirm on the basis of the trial court's Opinion. ***See*** Trial Court Opinion at 17-20 (concluding the prosecutor's remarks about the issue regarding Appellant's name constituted fair response to Appellant's closing argument alleging "shoddy paperwork" and disparaging the Commonwealth's investigation).

The parties are instructed to attach a copy of the trial court's December 21, 2015 Opinion to all future filings.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2016

- 6 -



FILED

DEC 21 2015

Criminal Appeals Unit
First Judicial District of PA

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH        :        CP-51-CR-0008145-2014

:

vs.

:

:

LANIER JAMES        :        SUPERIOR COURT
2865 EDA 2015

## OPINION

BRINKLEY, J.                              DECEMBER 21, 2015

A jury found Defendant Lanier James guilty of two violations of the Uniform Firearms Act (VUFA): Carrying a Firearm Without a License, § 6106; and Carrying a Firearm on the Street or Public Place in Philadelphia, § 6108. He was further found guilty of Possession of an Instrument of Crime (PIC) and Fleeing or Attempting to Elude Police. This Court sentenced him to an aggregate sentence of 6 to 12 years state incarceration plus 7 years reporting probation. Defendant appealed this judgment of sentence and raised the following issues for appellate review: (1) whether the evidence was sufficient to support Defendant's convictions for carrying a firearm without a license, § 6106; and fleeing or attempting to elude police; and (2) whether the Commonwealth improperly argued facts not in evidence or inferences not fairly drawn from the evidence during its closing arguments. This Court's judgment of sentence should be affirmed.

# PROCEDURAL HISTORY

On May 28, 2014, Aaron Johnson was shot fatally multiple times near the 1300 block of Frazier Street in Philadelphia. Defendant and his co-defendant Brahcem Owens ("Owens") were arrested and charged in connection with this murder. From May 19 to May 27, 2015, Defendant and Owens appeared before this Court for a jury trial. The jury found Defendant guilty of two violations of the Uniform Firearms Act (VUFA): Carrying a Firearm Without a License, § 6106; and Carrying a Firearm on the Street or Public Place in Philadelphia, § 6108. He was further found guilty of Possession of an Instrument of Crime (PIC) and Fleeing or Attempting to Elude Police. The jury found Defendant not guilty of first-degree murder and conspiracy.

On August 14, 2015, this Court sentenced Defendant as follows:

| | | |
|---|---|---|
| VUFA 6106 | (F3) | 3 ½ to 7 years state incarceration |
| VUFA 6108 | (M1) | 2 ½ to 5 years state incarceration |
| PIC | (M1) | 5 years reporting probation |
| Fleeing police (M2) | | 2 years reporting probation. |

This resulted in an aggregate sentence of 6 to 12 years state incarceration plus 7 years reporting probation. This Court ordered Defendant to complete drug treatment and, upon release, undergo random urinalysis, complete job training, seek and maintain employment, stay out of trouble with the law, and pay all mandatory court costs and supervision fees.

On September 8, 2015, Defendant appealed this judgment of sentence to Superior Court. On October 8, 2015, defense counsel submitted a Concise Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b).

2

## FACTS

On May 28, 2014, at approximately 11:45 a.m., decedent Aaron Johnson ("Johnson") was shot multiple times on the 1300 block of Frazier Street in West Philadelphia.

A jury trial in this matter commenced on May 19, 2015. The Commonwealth first called Police Officer George Williams to testify. Officer Williams stated that he was in uniform, in his marked patrol car, when he heard several gunshots. As he approached the corner of Frazier and Thompson Streets, he saw a black male running and firing at a group of males. Officer Williams identified Owens as the shooter. Owens ran behind a parked Nissan Maxima and continued to fire his weapon. Owens then entered the vehicle's passenger side. Officer Williams exited his vehicle and approached the driver's side of the Nissan with his gun drawn. He described the driver as a lighter skinned black male. Officer Williams testified that his plan was to hold the car at the location at gunpoint until back up officers arrived on the scene. However, there was just enough space for the car to get past him and speed down the block. He chased the car for a half a block, shouting into his radio to update fellow officers on the situation and provide a description of the car and suspects. After his radio fell off his belt, Officer Williams decided to turn around and attend to the victim. (N.T. 5/19/15, p. 71-104).

Brandon Woods ("Woods") testified next. He stated that he was a neighborhood friend to the decedent Aaron Johnson, and that on the day of the shooting, he was at home on the 1300 block of Frazier Street. He testified that Johnson was riding Woods' bicycle that day outside on the street. Woods stated that he saw Anthony Evans (a/k/a Anthony Johnson) and Shuron Briggs outside on the porch, and then Woods went inside his house. Approximately 5-10 minutes later, he heard several gunshots. Evans ran into Woods' house and everyone hid on the floor. After

3

waiting a few minutes, Woods went outside to see what had happened and saw his bicycle in the street and Johnson lying on the ground. Id. at 154-171.

Anthony Evans (a/k/a/ Anthony Johnson) ("Evans") testified next. He stated that on the day of the shooting, he was outside alone on his front porch on the 1300 block of North Frazier Street. A group of 8 to 10 men, including Shuron Briggs and a man named "Eric," was outside on the adjacent porch. Evans saw Johnson, sitting on Woods' bicycle, speaking to one of the men on the porch. Evans testified that he then went inside to eat lunch. After a few minutes, he heard gunfire. When the shooting subsided, Evans ran outside and saw Johnson lying in the street. Evans denied seeing men running down the street with firearms, even though that was what he originally said in his statement to homicide detectives. Id. at 189-220. In his original statement to police, Evans had described the event as follows:

> I was on my porch with my friends Eric and Drew on the porch at [address redacted] and there was a bunch of young guys sitting out smoking weed. I went in the house to cook some food that I had from last night. When I came outside a couple minutes later with my food—and then a couple minutes later I see three guys coming down the block from Master Street. I see that two of the guys are carrying guns, and all the guys on the porch next door start running in the house, and some of them run down the block. I see the guys with the gun in front of 1227 standing in the middle of the street and they are shooting. I run in the house and waited for the shooting to stop, and when I came out, I see the guys running back up towards Master Street. I see the police car at Frazier and Thompson Street. I run down the block, and I see Aaron laying in the street, and he was breathing a little bit and he was bleeding bad. Then the police put Aaron in the police wagon and went down Thompson Street.

Id. at 221-222. In his police statement, Evans further described the gunmen as "black males with black hoodies. I think the one had a black shirt on...They both had black guns, and they were holding them in their right hand...After this shooting stopped, I came out of my house. The three

4

guys were standing outside of 1327 in the middle of the street. Then they started running towards Master Street. That's where Aaron got shot. He ran in that direction." Id. at 223-224.

Homicide Detective Brian Peters testified next. He stated that he interviewed Evans on the day of the murder. Detective Peters testified that at the time of the interview, Evans was not impaired or under the influence of any substance. He further testified that he did not suggest any answers to Evans, and that he did not know at that time what evidence had been seized by police in connection with this crime. Last, Detective Peters testified that Evans carefully reviewed each question and answer provided during the interview, and signed the statement at the bottom. (N.T. 5/20/15, p. 5-27).

Shuron Briggs ("Briggs") testified next for the Commonwealth. He stated that on the morning of the shooting, he was standing on a front porch with some friends, including Anthony Evans, talking about sports. He heard gunshots, so he jumped over the railing with two friends and hid on the ground. Briggs testified that Brandon Woods was inside the house the entire time, not outside on the porch. Briggs further testified that his back was turned towards the street and that he never saw the decedent Johnson in the area. After the gunshots ended, Briggs and his friends ran through the alleyway and into a house. They returned outside and saw Johnson lying in the street. Briggs testified that he spoke with homicide detectives the following week and gave a formal statement to police. He told detectives that based upon the gunfire, he believed there were two shooters but he did not see their faces. Id. at 62-94.

Next, Detective Edward Tolliver testified. He stated that he and Detective Moles interviewed Briggs in connection with the murder of Aaron Johnson. He reviewed the written statement and confirmed that Briggs told him he believed there were two shooters, although he did not see them. Id. at 116-143.

5

Police Officer Ryan Mundrick testified that on May 28, 2014, he was on duty in an unmarked police car at the intersection of 60th and Thompson Streets when he received a radio call regarding a shooting on the 1300 block of North Frazier Street. The radio call included a flash description of the shooting suspects: two black males traveling west on Thompson Street in a red or burgundy Nissan bearing out-of-state license plates. Officer Mundrick stated that he pulled up closer to the intersection so he could observe oncoming traffic better. Almost immediately, he saw a burgundy Nissan Maxima speeding down Thompson Street, flying through stop signs and swerving as though the driver was not in complete control of the vehicle. Officer Mundrick stated that he followed the car when it turned north onto Hobart Street, and pulled up behind it when parked near the corner of Hobart and Thompson Streets. He testified that he saw Defendant exit the driver's side of the vehicle and saw Owens exit the passenger side. Defendant was wearing light gray sweat pants and a hooded sweatshirt with a black t-shirt underneath. Officer Mundrick stated that Defendant and Owens looked directly at him after they exited their vehicle and then began to run north on Hobart Street. He followed them and saw them turn into an abandoned lot near the middle of the block. Officer Mundrick then turned south onto Wanamaker Street and saw Defendant, now wearing just light gray sweatpants and a black t-shirt, run down Wanamaker and then sit down on the front steps of a house. Officer Mundrick drove towards Defendant, who was visibly out of breath, but Defendant saw him and began to run again. As Defendant changed directions and attempted to cross the street, he was struck by Officer Mundrick's police vehicle. Officer Mundrick, with the assistance of Officer Butler, placed Defendant in handcuffs. He recovered a Glock handgun from the front waist area of Defendant's pants. He further recovered a set of keys from Defendant's pocket. Officer Butler inspected the handgun in Officer Mundrick's presence and discovered there was one round in the

6

chamber and nothing else in the cartridge. Officer Mundrick then drove to the Nissan Maxima and made sure it was secure. He then went to 58th and Master Street to identify a possible suspect; however, the person in question was not Owens. Police then summoned Officer Mundrick to an abandoned house in the alleyway between Hobart and Wanamaker Street. Officer Mundrick went into a second floor bedroom and identified Owens as the vehicle passenger. Id. at 163-219.

Dr. Albert Chu, Assistant Medical Examiner in the Philadelphia Medical Examiner's Office, testified next for the Commonwealth. He stated that he reviewed the autopsy report and photos prepared by Dr. Marlon Osbourne, a medical examiner no longer employed by the city. Based upon his expertise, Dr. Chu testified that Aaron Johnson died from two gunshot wounds— one to the back and the other to the hip. The bullet that entered his back struck his left lung and aorta. The bullet that entered his hip exited to the right of his groin. Dr. Chu testified that the shot to the back was fatal and that Johnson's manner of death was in fact homicide. (N.T. 5/21/15, p. 14-26.

Next, Police Officer Roland Butler testified. He stated that on May 28, 2014, he received a radio call from Officer Williams regarding a shooting in progress. He then heard Officer Mundrick come over the radio and inform fellow officers that he was in pursuit of two suspects. Officer Butler drove over to Officer Mundrick's location on Wanamaker Street. When he arrived, he saw Officer Mundrick struggling to place Defendant under arrest. Officer Butler assisted with the arrest and then patted down Defendant for weapons. He recovered a Glock .45 caliber handgun from Defendant's front waistband. He removed the clip and there was one round loaded inside the chamber. Officer Butler testified that Defendant's eyes were rolling back in his

7

head and that there was a large "gash" on the back of his skull, so he called for an ambulance and Defendant was taken to the hospital. Id. at 32-50.

Police Officer Maurice Sutherland testified next. He stated that he responded in a police wagon to the shooting on the 1300 block of North Frazier Street. When he arrived on the scene, he saw Johnson lying on the ground covered in blood, showing no signs of life. He and the other officers put on gloves, put Johnson into the wagon, and drove him to the Hospital of the University of Pennsylvania, where he was pronounced dead. Officer Sutherland testified that he was interviewed by homicide detectives regarding the transport of Johnson to the hospital. Id. at 76-87.

Police Officer Christine Hilbert took the stand and testified that she worked as part of the Crime Scene Unit. She reviewed and analyzed the Nissan Maxima used by Defendant and Owens to escape the crime scene. She stated that she photographed the vehicle, took DNA samples and processed it for fingerprints. Officer Hilbert testified that she was able to lift 14 fingerprints from the vehicle. Id. at 90-114.

Police Officer Edward Fidler, a member of the Crime Scene Unit, testified next. He stated that he went to the 1300 block of North Frazier Street and took photographs of the crime scene, documenting the locations of the ballistic evidence markers and bloodstains in the street. Using the crime scene photographs to illustrate, Officer Fidler testified as to the area where the fired cartridge casings were located, which indicated the approximate location of the shooter(s). He later went to the Nissan Maxima on Hobart Street and took photographs of the vehicle. He also took photographs on Wanamaker Street. Id. at 158-218.

Next, the Commonwealth entered two self-authenticating documents into evidence. First, the Commonwealth entered a certificate from the Pennsylvania State Police, indicating that they

8

had reviewed state records and determined that Owens did not have a valid license to carry a firearm nor did he have a valid sportsmen's permit to carry a firearm in the Commonwealth of Pennsylvania. Second, the Commonwealth entered a similar certificate from the Pennsylvania State Police indicating that on May 28, 2014, Defendant did not have a valid license to carry a firearm nor did he have a valid sportsmen's permit to carry a firearm. (N.T. 5/22/15, p. 15-17).

Scott Copeland ("Copeland"), Forensic Scientist III in the Latent Print Unit of the Philadelphia Police Department of Criminalistics, testified next as an expert in fingerprint identification and comparison. He stated that he received the fingerprint cards collected by Officer Hilbert and compared the prints to those of the suspects in the case. After the initial comparison, Copeland determined that none of the fingerprints matched Owens or Defendant. His work was peer reviewed by a coworker, who agreed with his assessment. However, immediately before Copeland was scheduled to come to court to testify in this matter, he reexamined the fingerprints and discovered that he had made a mistake. One of the fingerprints in the Nissan matched Owens. Two additional forensic scientists trained in fingerprint analysis examined the fingerprints and agreed that they matched Owens. Id. at 17-72.

Next, Police Officer Gregory Welsh testified as an expert in firearms examination. He examined the firearm recovered from Defendant and determined that it was a Glock Model 30 .45 caliber weapon. This weapon was a fully operable, semi-automatic firearm, with gunshot residue already in the barrel. Officer Welsh also examined the cartridge that was submitted with the gun, and determined that it was a caliber .45 auto. He test-fired it and it was operable. He also examined 28 fired cartridge casings recovered from the crime scene and determined that they were of four different calibers, including: .45 caliber, 9 mm, .380 automatic, and .40 Smith

9

and Wesson. All six of the .45 caliber fired cartridge casings matched the Glock .45 caliber firearm recovered from Defendant. Id. at 80-134.

Detective Charles Grebloski testified next. He testified that he and his partner were assigned to investigate the murder of Aaron Johnson. When he arrived at the crime scene, he canvassed the neighborhood to locate possible witnesses and security footage in the area. He and other Crime Scene Unit officers then searched the abandoned house on Wanamaker Street and were unable to recover a firearm. They also searched the surrounding area without success. After running the vehicle information through the computer system, Detective Grebloski determined that Nissan Maxima was a rental car belonging to Hertz Rent-A-Car. He further testified that he obtained search warrants for four cell phones, including those belonging to Owens and Briggs. Id. at 158-185; (N.T. 5/26/15, p. 10-29).

At the conclusion of Detective Grebloski's testimony, the Commonwealth rested. Defense counsel made a motion for judgment of acquittal on behalf of Defendant. He argued that the evidence was insufficient as a matter of law to sustain a verdict as to any of the charges against Defendant. This Court denied that motion, finding that there was sufficient evidence for the case to go to the jury for deliberation. Id. at 39-40.

Defendant called Cecil Landon, Defendant's step-father, and Dolores Richardson, Defendant's step-grandmother, to testify as character witnesses. They both testified that they had known Defendant all his life and that he was regarded in the community as being a peaceful, non-violent person. Id. at 46-48.

Next, co-defendant Braheem Owens took the stand. He stated that on May 28, 2014, he drove in a rented Nissan Maxima from his mother's house at 57th and Spruce Streets to his friend's grandmother's house at 51st and Arch Streets. When he arrived, several friends,

10

including Defendant, were playing video games. At approximately 11:30 a.m., Defendant asked Owens to drive him to his grandmother's house in Overbrook Park. Owens testified that Defendant asked if he could drive since he was more familiar with the area. As they drove near the intersection of Frazier and Thompson Streets, he asked Defendant to pull over so he could purchase something from a bodega on the corner. Owens walked to the bodega and discovered that it was closed. As he was returning to the vehicle, he heard gunshots and saw people running towards him. Owens stated that he then pulled out his own gun, which he was carrying illegally since he had a robbery conviction that rendered him ineligible to possess a firearm. Owens testified that he began firing the gun at the people running towards him as he ran back to the car. He saw Officer Williams nearby in his police car so Owens jumped in the Nissan and told Defendant to "go, go, go." Owens stated that he threw the gun at Defendant and when Defendant pulled the car over, he jumped out and ran because he didn't want to get into trouble for having a firearm. He denied seeing Officer Mundrick parked behind them in an unmarked vehicle. Owens testified that he ran into an alleyway and then into an abandoned house and hid in a second floor bedroom, where the police later found him. Owens stated that he did not know at the time whether someone had been shot during the shoot out. He denied knowing anybody who lived on Frazier Street, including Johnson, Briggs, and Evans. Id. at 52-68, 137, 149-151.

At the conclusion of Owens' testimony, counsel entered evidence by way of stipulation by and between counsel. Counsel stipulated that if the Clerk of Quarter Sessions were called to testify, she would state that Owens was arrested on October 13, 2008 and charged with robbery, graded as a felony of the first degree—threatening immediate serious bodily injury, and that Owens pled guilty to this charge on October 3, 2009. Id. at 156.

11

## ISSUES

I. WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT DEFENDANT'S CONVICTIONS FOR CARRYING A FIREARM WITHOUT A LICENSE, § 6106; AND FLEEING OR ATTEMPTING TO ELUDE POLICE.

II. WHETHER THE COMMONWEALTH IMPROPERLY ARGUED FACTS NOT IN EVIDENCE OR INFERENCES NOT FAIRLY DRAWN FROM THE EVIDENCE DURING ITS CLOSING ARGUMENTS.

## DISCUSSION

I. THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO FIND DEFENDANT GUILTY OF CARRYING A FIREARM WITHOUT A LICENSE AND FEELING OR ATTEMPTING TO ELUDE POLICE.

The evidence adduced at trial was sufficient to support the jury's finding of guilt on the charges of carrying a firearm without a license and fleeing or attempting to elude police.

### A. Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually

12

received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

### B. The evidence was sufficient to find Defendant guilty of violation of the Uniform Firearms Act 6106.

The evidence presented at trial was sufficient to find Defendant guilty of carrying a firearm without a license (VUFA 6106). Any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license commits a felony of the third degree. 18 Pa.C.S.A. § 6106(a)(1). In order to convict a defendant for carrying a firearm without a license, the Commonwealth must prove: "(a) that the weapon was a firearm, (b) that the firearm was unlicensed, and (c) that where the firearm was concealed on or about the person, it was outside his home or place of business." Commonwealth v. Parker, 2004 PA Super 113, 847 A.2d 745, 750 (2004) (quoting Commonwealth v. Bavusa, 750 A.2d 855, 857 (Pa.Super. 2000)). To prove possession of a firearm, the Commonwealth must establish that an individual either had actual physical possession of the weapon or had the power of control over the weapon with the

13

intention to exercise that control. In re R.N., 2008 PA Super 117, 951 A.2d 363, 369-70 (2008) (citing Commonwealth v. Carter, 304 Pa.Super. 142, 450 A.2d 142, 144 (1982)).

In the case at bar, the evidence was sufficient for the jury to find Defendant guilty of carrying a firearm without a license. The record reflects that Owens testified that he gave his Glock handgun to Defendant as they sped away from the scene of the shooting in the Nissan Maxima. Officer Mundrick and Officer Butler testified that after they placed Defendant under arrest in the middle of Wanamaker Street, they recovered a Glock handgun from the front waistband area of Defendant's pants. The Commonwealth entered into evidence a certificate of non-licensure issued by the Pennsylvania State Police, indicating that on May 28, 2014, the date Defendant was arrested, he did not possess a valid license to carry a firearm or a valid sportsmen's license.[1] Officer Welsh testified that he examined the Glock handgun that was recovered from Defendant's waistband and determined that it was a fully operable, semi-automatic firearm. All of this evidence was sufficient for the jury to find Defendant guilty of carrying a firearm without a license. The firearm was operable, Defendant did not have a valid license to carry the firearm, and it was taken from his person outside of his home or place of business. Defendant had actual physical possession of this firearm as it was recovered from inside the front waistband area of his pants. Thus, the jury properly found Defendant guilty of this crime.

---

[1] Defendant claims that the certificate of non-licensure was invalid because the Pennsylvania State Police searched under the name "James Lanier," the name Defendant was using in this matter until immediately before trial when he petitioned to have the name changed to "Lanier James." In its closing argument, the Commonwealth stated that the State Police searched under both "James Lanier" and "Lanier James," and searched using Defendant's home address and date of birth as search terms. None of these yielded any evidence that Defendant possessed a valid license to carry a firearm on the date of the shooting.

14

## C. The evidence was sufficient to find Defendant guilty of fleeing or attempting to elude an officer.

The evidence presented at trial was sufficient to find Defendant guilty of fleeing or attempting to elude an officer. Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop, commits the offense of fleeing or attempting to elude an officer. 75 Pa.C.S.A. § 3733(a). The signal given by the police officer may be by hand, voice, emergency lights or siren. 75 Pa.C.S.A. § 3733(b). There are two defenses available under the statute. First, it is a defense that the pursuing police officer's vehicle was not clearly identifiable by its markings or, if unmarked, was not occupied by a police officer who was in uniform and displaying a badge or other sign of authority. 75 Pa.C.S.A. § 3733(c)(1). Secondly, it is a defense if the defendant can show by a preponderance of the evidence that the failure to stop immediately for a police officer's vehicle was based upon a good faith concern for personal safety. 75 Pa.C.S.A. § 3733(c)(2).

In the case at bar, the jury properly found Defendant guilty of fleeing or attempting to elude an officer. The record shows that Defendant was the driver of the Nissan Maxima used to flee the scene of the shooting. Officer Williams testified that he arrived on the scene, in uniform and in a marked patrol car, as the shooting was in progress. He observed Owens shooting at a group of men, so he stopped his vehicle, opened the police car door, and drew his own weapon. Officer Williams testified that Owens saw him, lowered the gun, and got into the passenger side front seat of the car. Officer Williams approached the vehicle on the driver's side with his gun drawn but the car had enough room to pull away and speed off down the street. He chased the car for half a block and shouted into his radio, "Priority. Gun. Shots fired. Male down. I got two black males going west on Thompson in a burgundy or red vehicle." (N.T. 5/19/15, p. 77).

15

However, as he was running, his radio fell off his belt so he turned back and attended to the shooting victim.

This evidence was sufficient for the jury to find Defendant, the driver of the vehicle, guilty of fleeing or attempting to elude an officer. The statute makes it clear that a driver of a motor vehicle is guilty of this crime if he flees a pursuing police officer when given visible and audio signals to stop. Here, Officer Williams, in full uniform, parked his marked patrol car near the store on the corner as Owens was still shooting at the victim. Officer Williams exited his vehicle, and approached Defendant's vehicle on the driver's side with his gun drawn. Instead of remaining on the scene and speaking with Officer Williams, Defendant pulled into the street and sped away at a high rate of speed. Officer Williams testified that he then ran after the car for half a block, shouting into his police radio, before deciding to render aid to the shooting victim. Even with a fully-uniformed police officer chasing behind him, Defendant continued to speed away and failed to stop his vehicle. The jury, as fact-finder, believed Officer Williams' testimony that he tried to stop the car from leaving the scene and chased it down the block. The jury further believed that Defendant was aware of Officer Williams approaching the driver's side of the Nissan Maxima with his gun drawn, and that he knew Officer Williams was chasing them as they sped away. In spite of these signals for him to stop, Defendant continued to flee the scene of the shooting in the Nissan Maxima. This evidence cannot be said to be "so weak and inconclusive that, as a matter of law, no probability of fact could be concluded." Rather, the jury properly found that Defendant was aware of Officer Williams even before he sped away in the car, and should have stopped the vehicle once Officer Williams began to chase after them. Accordingly, the jury's finding that Defendant was guilty of fleeing or eluding police should be affirmed.

16

## II. THE PROSECUTOR DID NOT BY IMPROPERLY ARGUING FACTS NOT IN EVIDENCE DURING HIS CLOSING STATEMENT.

The prosecutor did not improperly facts in evidence during his closing statement when he referred to Defendant's use of an alias. While a closing argument must be based upon evidence in the record or reasonable inferences therefrom, a prosecutor is permitted to respond to defense evidence and engage in oratorical flair. Commonwealth v. Culver, 2012 PA Super 172, 51 A.3d 886, 878 (2012) (citing Commonwealth v. Basemore, 525 Pa. 512, 582 A.2d 861, 869 (1990)). Allegedly improper remarks of a prosecutor during closing arguments must be viewed in the context of the closing argument as a whole. Commonwealth v. Smith, 604 Pa. 126, 985 A.2d 886, 907 (2009) (quoting Commonwealth v. Washington, 549 Pa. 12, 700 A.2d 400, 407-08 (1997)).

In defining what constitutes impermissible conduct during closing argument, Pennsylvania follows Section 5.8 of the American Bar Association (ABA) Standards. Section 5.8 provides: (a) the prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw; (b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury; (d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. Commonwealth v. Judy, 2009 PA Super 148, 978 A.2d 1015, 1019-20 (2009) (citing Commonwealth v. Sampson, 900 A.2d 887, 890 (Pa.Super. 2006)).

17

Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. Commonwealth v. Burno, 96 A.3d 956, 974 (Pa. Super. 2014) (quoting Commonwealth v. Elliott, 80 .2d 415, 443 (Pa. 2013). If a challenged remark is made in response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment. Commonwealth v. Keaton, 615 Pa. 675, 45 A.3d 1050, 1074-75 (2012) (citing Commonwealth v. Abu-Jamal, 553 Pa. 485, 720 A.2d 79, 110 (1998)). Furthermore, a prosecutor's comments do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant so that they could not weigh the evidence objectively and render a true verdict. Id.

In the case at bar, Defendant motioned for a mistrial after the prosecutor made the following remark during his closing statement:

> Nothing said by counsel, although I made reference to them, actually – actually surprise me with the exception of one thing by Mr. Petrone. He referred to the certificate of nonlicensure that the Commonwealth introduced against James Lanier to show that because it was in the name of James Lanier as opposed to Lanier James you can find that the Commonwealth actually failed to prove that this man didn't have a permit for a firearm.
>
> Ladies and gentlemen, the reason that's surprising is because two business days before trial, there was communication by and between counsel for the Commonwealth and defense, Mr. Petrone, where he spoke of and sought to change what he described as correcting the record in this case and his client's real name, saying that his real name is Lanier James, not James Lanier.
>
> Well, James Lanier was the name in the court docket. That's the name that had been given to law enforcement, but if you wanted to charge [sic] his client's name, he could call him whatever he wanted to. I didn't have an objection to that when he filed the motion.
>
> And then for the first time at closing he suggests to you that because an alias has been used by his client, he should get the benefit of that because the certificate of nonlicensure is in the

18

name of the alias. The defendant lives with the name James Lanier and the Pennsylvania State Police records were checked under what is the same date of birth, under either name, and the same address under either name, then he lives with it. That's what he provided."

(N.T. 5/27/2015 p. 97-99). Defendant argued that the reference to his name was unduly prejudicial as it suggested without evidence in the record that Defendant used an alias and that defense counsel was acting dishonestly when he filed a motion to change Defendant's name on the court docket. The Commonwealth argued in response that the reference was fair response to Defendant's closing statement. This Court subsequently denied Defendant's motion for a mistrial. Id. at 108-110.

The prosecutor did not commit misconduct in his closing statement and this Court did not err when it denied Defendant's motion for a mistrial based upon alleged prosecutorial misconduct. Contrary to Defendant's assertions, the remarks were fair response to arguments made by defense counsel during his closing statement. Specifically, defense counsel made the following remark during his closing statement:

> What do they do when they send in the request to see if my client, Lanier James, is licensed in the Commonwealth to possess and carry a firearm in public? They send in a form that says "James Lanier," not even the same guy. Shoddy paperwork but that's technical. And, frankly, technically they haven't proven vis-à-vis this document. You can't take it upon yourself to say, well, turn the names around. You can't do that. It's like when you send in something to check to see if someone has a driver's license and you send it in and it says "James Lanier," it comes back no license. That doesn't mean they checked James Lanier the other way, Lanier James.

(N.T. 5/26/2015 p. 177). Thus, the prosecutor's comments regarding Defendant's name was fair response to rebut the statements made during Defendant's closing argument that the Commonwealth's investigation of Defendant was somehow shoddy or haphazard because they

19

investigated James Lanier instead of Lanier James. Significantly, the Commonwealth noted that the name "James Lanier" was the name on the court docket until Defendant requested the change only one full business day prior to trial and therefore it was the name used to investigate Defendant. Consequently, the statements made by the prosecutor were fair response to the statements made by defense counsel which suggested that the Commonwealth had conducted such a shoddy and poor investigation of Defendant that they had investigated the wrong name. Therefore, the prosecutor did not commit misconduct in his closing statement and this Court did not err when it denied Defendant's motion for a mistrial based on the closing statement.

## CONCLUSION

After reviewing the applicable statutes, case law and testimony, this Court committed no error. The evidence was sufficient for the jury to find Defendant guilty of carrying a firearm without a license in violation of § 6106 of the Uniform Firearms Act, and fleeing or attempting to elude police. Additionally, the Commonwealth did not commit make any improper remarks in its closing argument. Accordingly, this Court's judgment of sentence should be affirmed.

BY THE COURT:

_Brinkley_